UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRASON LEE,<br><br>        Plaintiff,<br><br>    v.<br><br>NATOMAS UNIFIED SCHOOL DISTRICT, et al.,<br><br>        Defendants. | No.  2:13-cv-00181-MCE-EFB<br><br>**MEMORANDUM AND ORDER** |

Through the present action, Plaintiff Brason Lee ("Plaintiff") claims he was retaliated against by the Natomas Unified School District ("Defendants" or "NUSD") for advocating on his daughter's behalf with respect to the provision of special educational services. According to Plaintiff, Defendants' conduct in this regard ran afoul of both Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, (hereinafter "Section 504") and Title II of the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq. ("ADA"). Currently before the Court is Defendants' Motion for Summary Judgment, or alternatively for summary adjudication as to certain claims.  (ECF No. 14).  For the reasons set forth below, Defendants' Motion is DENIED.[1]

---

[1] Because oral argument will not be of material assistance, the Court ordered this matter submitted on the briefs. E.D. Cal. Local Rule 230(g).

1

# BACKGROUND[2]

Plaintiff is the parent of a student ("Student") who previously attended Two Rivers Elementary in the Natomas Unified School District ("NUSD").  Beginning in 2007, when she had not yet turned three years of age, Student began receiving speech and language services from NUSD.  Student was eligible for such services under the Speech and Language category of the Individuals with Disabilities in Education Improvement Act ("IDEA").

In 2009, while Student was still in preschool, NUSD conducted a psycho-educational assessment ("Assessment"), which concluded that Student had a disability which fell along the Autism spectrum.  Based on this Assessment, NUSD determined that Student should continue to receive speech and language services from NUSD. Decl. of Suzanne Johnstone ("Johnstone"), ECF No. 14-8, ¶ 6.  Plaintiff disagreed with a number of the conclusions in the Assessment and was active in voicing that disagreement.  Plaintiff authored a letter to the NUSD Board of Trustees ("Board") in September of 2009, setting forth his disagreement with the Assessment in an attempt to have it removed from Student's record.  Id. at ¶ 9.

Although the Board found the Assessment was proper, Plaintiff continued to request that the Assessment be removed from Student's record in subsequent correspondence with NUSD.  Id.  He authored numerous written communications in that regard, which Plaintiff claims represented an effort to advocate on behalf of his daughter's rights.  These communications included allegations that the Director of NUSD's Special Education Program, Suzanne Johnstone ("hereinafter referred to as Director"), and other NUSD staff, acted unlawfully and/or unethically, and falsified records as to compliance with Student's Individualized Education Program ("IEP"). Johnstone at ¶ 10.  In providing the needed speech and language therapy services, Student's March 22, 2010, IEP called for sixty (60) sessions per school year, at twenty-

---

[2] Unless otherwise noted, the following facts are taken from Plaintiff's Complaint.  ECF No. 1.

2

five (25) minutes each, with licensed speech and language pathologist Sean Green ("Green"). Id. at ¶ 7. Green scheduled these sessions at a rate of approximately two times per week. Id. Plaintiff believed that NUSD was failing to comply with the terms of the IEP and subsequently falsifying records to show Student had received services when she had not. Id. at ¶¶ 10, 12, 21.

In July 2010, Plaintiff approached Green to allege that his daughter was not receiving the speech therapy outlined in her IEP. Decl. of Sean Green ("Green"), ECF No. 14-7, ¶¶ 5-7. Green claims he tried to assure Plaintiff that Student's speech therapy had started, but Plaintiff stated that this was "hard to believe." Id. On another occasion, Plaintiff asked Green to meet him outside of campus, but did not state the purpose for the meeting, and refused to make an appointment with him at school to discuss Student's program. Id.

On October 8, 2010, Plaintiff emailed a copy of an article titled "Administrative Pressures to Practice Unethically: Research and Suggested Strategies" to Student's first grade teacher, as well as to Sean Green. Johnstone at ¶ 11. On October 6, 2010, Plaintiff emailed Dr. Susan Heredia, a NUSD Board member, to complain that Student was not receiving her scheduled speech therapy. Decl. of Bobbie Plough ("Plough"), ECF No. 14-5, ¶ 4. In this correspondence Plaintiff made accusations that NUSD staff had engaged in "periodic alterations in speech services" as retaliation for a "parental challenge." Id. This e-mail was shared with Bobbie Plough ("Superintendent"), the then Superintendent of NUSD, who proceeded to tell Plaintiff that she would contact Green to ensure his compliance with Student's IEP. Id. at ¶¶ 4-6.

Plaintiff responded to the Superintendent's e-mail on October 11, 2010, and copied that response on all NUSD Board members, as well as on Plaintiff's own attorney. Id. at ¶ 7. Plaintiff stated that he would "hold [Superintendent] personally accountable for the truthfulness and accuracy of all information provided to [Plaintiff] from [that] date and [would] consider any continued acts of deception or misrepresentation by NUSD officials as acts endorsed by [Superintendent] and the

1  Board." Id. The Superintendent perceived those statements as an accusation that she
2  and the Board would attempt to deceive Plaintiff in future communications regarding
3  Student. Id. Two days later, on October 13, 2010, the Director e-mailed Plaintiff,
4  summarized the scope of services provided in Student's March 22, 2010 IEP, and
5  reported on the number of speech and language therapy sessions provided. Johnstone
6  at ¶ 12. She additionally assured Plaintiff that Student would receive all contemplated
7  sessions during the IEP year. Id.
8        Following additional correspondence from Plaintiff to the Superintendent, to Two
9  Rivers Principal Leslie Sargent ("Principal"), to NUSD's Board of Trustees, and to Sean
10 Green himself, the Superintendent became concerned that Plaintiff was challenging
11 staff's credibility and integrity. Plough at ¶¶ 9-10. She was also concerned about
12 Plaintiff's ultimatums in demanding specific time periods for particular responses, as well
13 as the inferences Plaintiff purported to draw from any failure to meet those deadlines.
14 Id. at ¶ 10. Because she felt "annoyed and harassed" by this course of conduct,
15 Superintendent Plough asked the Director to contact NUSD attorneys to see whether all
16 future communications with Plaintiff could be routed through counsel as opposed to
17 NUSD staff. Id. On October 22, 2010, an e-mail was sent to Plaintiff instructing him to
18 direct all future communications to NUSDs' attorney. Id. at ¶ 11.
19       Plaintiff approached Green the following day on school grounds, stating that
20 "[NUSD] is in trouble, we are talking about felonies, so be careful." Green at ¶ 10.
21 Plaintiff also asked Green whether he treated Plaintiff's daughter like his own child,
22 which Green claims he found bizarre and threatening. Id.
23       On October 24, 2010, Plaintiff wrote a letter to the Office of Special Education
24 Programs ("OSEP") of the U.S. Department of Education, which was copied to the
25 Principal, the entire NUSD Board, the Director of the Sacramento Special Education
26 Local Plan Area, Green, Student's classroom teacher, and "other interested parties."
27 Plough at ¶ 12. The letter made multiple requests, and alleged that NUSD engaged in
28 ///

4

retaliatory practices as a result of Plaintiff's challenge to Student's March 2009 Assessment, and further accused staff of falsifying Student's IEP records. Id.

Additionally, in an October 25, 2010, email to the Department Chair of the Bilingual Education Program at Sacramento State University, Plaintiff alleged that an escalating situation existed where acts of misrepresentation had become fraud, and were personally continued by the Superintendent. Plough at ¶ 14.

On November 4, 2010, the Principal observed Plaintiff sitting on a bench in front of the main office approximately 25 minutes before Student would be let out of class. Decl. of Leslie Sargent ("Sargent"), ECF No. 14-6, ¶ 8. Typically, parents begin to arrive no sooner than five to 10 minutes before the end of a school day. Id. The Principal commented to Plaintiff that he was there early and asked if he had signed in at the office. Id. at ¶ 9. Plaintiff stated, "I am just sitting here." Id. The Principal advised Plaintiff of the district and school policy to sign in when on the campus. Id. Plaintiff responded that "the ladies [in the office] can see me; I sit here every day." Id. The Principal informed Plaintiff that he must follow the policy, which is provided to the parents in the "Parent/Student Handbook" at the beginning of the school year. Id. at ¶ 10. Plaintiff had previously received a copy of this policy and signed an acknowledgment of receipt. Id.

That same day, Plaintiff sent an e-mail to the Superintendent and the Board titled "Continued Parental Harassment? Brason Lee." Plough at ¶ 17. The e-mail relayed the encounter Plaintiff had that day with the Principal regarding the sign in policy, and expressed Plaintiff's belief that the incident was yet another example of the harassment he was subjected to after challenging Student's Assessment in 2009. Id.

On November 5, 2010, the Principal sent an e-mail to the Superintendent advising her that her staff were concerned about Plaintiff's habit of spending time on campus and taking notes. Id. at ¶ 18. She relayed that staff members were uncomfortable with Plaintiff's behavior. Id. The same day, Plaintiff sent an e-mail to Student's teacher stating that he had reviewed Student's spelling scores and noted that the average in the

report was too low. Sargent at ¶ 13. Plaintiff remarked that the additional comments appeared "suspicious." Id. Plaintiff requested a correction, but also commented that he hoped "the educational welfare of the children" was her "number one priority in practice," even if "administrative pressures may not always be consistent with this idea." Id. The teacher responded on November 6, 2010, expressing her concerns to Plaintiff that these statements questioned her integrity. Id.

On November 8, 2010, Student's teacher forwarded another e-mail she had received from Plaintiff to the Superintendent. That e-mail included a "friendly reminder" from Plaintiff that the teacher keep out of the district politics. Johnstone at ¶ 18. The teacher responded by asking Plaintiff to please stop discussing "district politics" with her so that she could focus on doing her job in the classroom. Sargent at ¶ 15. Plaintiff responded by stating that she should not allow people to communicate through her so that she would not be "involved in what appears to be a case of fraudulent records related to a federally-funded program." Id. at ¶ 16.

On or about November 9, 2010, NUSD's counsel wrote to Plaintiff's attorney at the request of the Superintendent, advising that Plaintiff's communication with district personnel was causing them "to feel extremely anxious and threatened." Plough at ¶ 19. NUSD counsel suggested a meeting with Plaintiff so that his concerns could be addressed. Id. Plaintiff unilaterally canceled the meeting. Id. at ¶ 23.

On January 14, 2011, the Director received a copy of a letter from the National Association of School Psychologists ("NASP") addressed to Clarissa Tuttle, a School Psychologist with NUSD. Johnstone at ¶ 25. The letter included a Complaint initiated by Plaintiff against Ms. Tuttle for her conduct in connection with the March 2009 Assessment. Id.

On February 1, 2011, the Superintendent, Director, and Green, in their individual capacities, and with a declaration from the Principal, petitioned the Sacramento Superior Court for a Temporary Restraining Order ("TRO") against Plaintiff that would prohibit his allegedly ongoing harassment. Def.s' Separate Statement of Undisputed Material Facts,

ECF No. 14-1, ¶ 12. Plaintiff alleges this petition was an attempt to halt or chill the advocacy and participation by Plaintiff in the special education process.

Plaintiff's "advocacy" for Student, specifically in reference to the submission on January 14, 2011, of "a complaint sent to the NASP against a school psychologist," was one of the purported reasons that the Director sought the restraining order. Pl's Evidence, ECF No. 18, Ex. H. Further, the Superintendent admitted in the filings for the restraining order that Plaintiff had forwarded a "complaint filed with the U.S. Department of Education." Id. The Superintendent subsequently attached a copy of the Complaint made by Plaintiff as part of her restraining order application. Id.

Plaintiff alleges the adverse actions taken by NUSD, if successful, would have effectively barred him from the school's campus, given the requested 50-yard keep away order. Opp., ECF No. 15, 7:16-20. Defendants contend that the petitions collectively sought to give Plaintiff an appropriate single point of contact, and were designed to deter conduct and communications that raised concerns for their own safety, reputations and well-being. Reply, ECF No. 22, 4:14-16; Green at ¶¶ 25-27; Plough at ¶ 26; Johnstone at ¶ 26. The petitions were ultimately denied by the Superior Court. Even after denial of the TROs, Plaintiff contends that NUSD continued to take actions against Student's interest, as well as his own. Decl. of Brason Lee ("Lee"), ECF No. 16, ¶ 25. Plaintiff eventually withdrew Student from the school district. Id.

## STANDARD

The Federal Rules of Civil Procedure provide for summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses. Celotex, 477 U.S. at 325.

///

Rule 56 also allows a court to grant summary judgment on part of a claim or defense, known as partial summary judgment. See Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."); see also Allstate Ins. Co. v. Madan, 889 F. Supp. 374, 378-79 (C.D. Cal. 1995). The standard that applies to a motion for partial summary judgment is the same as that which applies to a motion for summary judgment. See Fed. R. Civ. P. 56(a); State of Cal. ex rel. Cal. Dep't of Toxic Substances Control v. Campbell, 138 F.3d 772, 780 (9th Cir. 1998) (applying summary judgment standard to motion for summary adjudication).

In a summary judgment motion, the moving party always bears the initial responsibility of informing the court of the basis for the motion and identifying the portions in the record "which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968).

In attempting to establish the existence or non-existence of a genuine factual dispute, the party must support its assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits[,] or declarations . . . or other materials; or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 251-52 (1986); Owens v. Local No. 169, Assoc. of W. Pulp and Paper Workers, 971 F.2d 347, 355 (9th Cir. 1987). The opposing party must also demonstrate that the dispute about a material fact "is 'genuine,' that is, if the evidence is

such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In other words, the judge needs to answer the preliminary question before the evidence is left to the jury of "not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." Anderson, 477 U.S. at 251 (quoting Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)) (emphasis in original). As the Supreme Court explained, "[w]hen the moving party has carried its burden under Rule [56(a)], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. Therefore, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Id. at 87.

In resolving a summary judgment motion, the evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. Anderson, 477 U.S. at 255. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898 (9th Cir. 1987).

## ANALYSIS

### A.   Section 504 and ADA Retaliation Claims

Retaliation claims, whether brought pursuant to the ADA or Section 504, are analyzed under the same standard. Douglas v. Cal. Dept. of Youth Auth., 285 F.3d 1226, 1229 n.3 (9th Cir. 2002). Both statutes contain anti-retaliation provisions, which permit non-disabled persons standing to bring claims for retaliation suffered in protecting the rights of disabled persons. Barker v. Riverside Office of Edu., 584 F.3d 821, 824-28

///

9

(9th Cir. 2009). Significantly, the anti-retaliation provision in Title VI of the Civil Rights Act has been incorporated by the Rehabilitation Act and states:

> No recipient or other person shall intimidate, threaten, coerce, or discriminate against <u>any individual</u> for the purpose of interfering with any right or privilege secured by Section 601 of [the Civil Rights] Act or this part, or because he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this part.

34 C.F.R. § 100.7(e) (emphasis added). This regulation applies to all rights secured by the Rehabilitation Act pursuant to 34 C.F.R. § 104.61. Barker, 584 F.3d at 825 citing Weber v. Cranston, 212 F.3d 41, 48 (1st Cir. 2000) (granting standing under section 504 of the Rehabilitation Act to a mother who claimed the school system had retaliated against her personally for attempting to enforce her disabled child's rights). Moreover, as indicated above, because the ADA is interpreted in the same manner, the same retaliation provisions inure to it as well. Douglas, 285 F.3d at 1229 n.3 (cases interpreting the two laws are "interchangeable"). As a result, claims of retaliation are analyzed under the two laws by the same standard. Id.

The so-called McDonnell Douglas test provides the applicable standard for claims of retaliation. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Although the Supreme Court's decision in McDonnell Douglas was decided in the context of a Title VII retaliation claim, its initial requirement that a prima facie case of retaliation be made, followed by a burden-shifting analysis in assessing the viability of a retaliation claim, applies equally to retaliation claims like Plaintiff's herein brought under the ADA or Section 504. Barnett v. U.S. Air, Inc., 228 F.3d 1105, 1121 (9th Cir. 2000) (overruled on other grounds) (applying Title VII framework to ADA retaliation claims); Hodge v. Oakland Unified Sch. Dist., 2012 WL 1933678, at *8 (N.D. Cal. May 29, 2012) citing 34 C.F.R. § 104.33(b)(1).

First, to establish a prima facie claim of retaliation, Plaintiff must show that: (1) he engaged in a protected activity; (2) NUSD knew he was involved in a protected activity; (3) an adverse action was taken against him; and (4) a causal connection exists

between the protected activity and the adverse action.  Pardi v. Kaiser Permanente Hosp. Inc., 389 F.3d 840, 849 (9th Cir. 2004); Alex G. v. Board of Trustees, 387 F. Supp. 2d 1119, 1128 (E.D. Cal. 2005).  Consequently, if Plaintiff can establish a prima facie case of retaliation in the instant matter, the burden shifts to NUSD to show a legitimate, non-retaliatory purpose for its actions.  Pardi, 389 F.3d at 849.  If NUSD is able to demonstrate such a purpose, the burden shifts back to Plaintiff to demonstrate that the proffered reason is pretextual.  Brooks v. City of San Mateo, 229 F.3d 917, 928 (9th Cir. 2000).

### 1.    Protected Activity and Knowledge

Advocating for disabled students on issues related to their federal and state educational rights is a protected activity.  Hodge, 2012 WL 1933678, at *8 (holding plaintiff need not prove the school district in fact violated the IDEA; a genuine dispute about whether plaintiff was advocating for students based upon potential violations was sufficient to satisfy this first prong) citing Barker v. Riverside Cnty. Office of Edu., 584 F.3d 821, 824 (9th Cir. 2009); Alex G., 387 F. Supp. 2d at 1128 (holding the actions of a disabled child's parents, including filing requests for a due process hearing, and writing a letter complaining about the implementation of a settlement agreement, arguably established a prima face case of retaliation).  Additionally, Plaintiff need only prove that NUSD staff was aware of the protected activities.  Alex G., 387 F. Supp. 2d at 1128.

Plaintiff's issues with NUSDs' Board appear to have begun after he expressed his disagreement with Student's 2009 Assessment, where it was determined that Student had a disability which fell along the Autism spectrum.  Lee at ¶¶ 3-4.  This conflict appears to have set in motion the succeeding series of actions by Plaintiff, which included authoring numerous e-mails to various NUSD officials, where Plaintiff voiced his concern with Defendants' compliance with Student's IEP.  Id. at ¶ 8.  Plaintiff went so far as to lodge these complaints with the Department of Education, alleging that NUSD was falsifying documents to conceal their noncompliance.  Id. at ¶13.

Regardless of the accuracy of Plaintiff's concerns regarding the educational services his daughter was receiving, it seems clear that his motivation was to act as Student's advocate in ensuring that her educational needs were met. Such advocacy on Plaintiff's part qualifies as a protected activity under either the ADA or Section 504. Barker, 584 F.3d at 826 (holding that a special education teacher, who advocated on behalf of disabled students by voicing concerns that federal and state requirements were not met, had standing to bring a retaliation claim under Section 504 and the ADA). It is equally clear that Defendants were aware of this protected activity, since it was NUSD officials who were at the receiving end of the complaints at issue. Thus, the requisite protected activity and knowledge elements in establishing a prima facie case of retaliation appear to have been met.

### 2. Adverse Action

An adverse action is an act that likely would have dissuaded a person from making a complaint. Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53, 68 (2006); Alex G., 387 F. Supp. 2d at 1129 (finding that defendants' request for a TRO to unilaterally change the student's educational placement was a factor to prove adverse action by the defendant). Here, Defendants filed three applications for a restraining order against Plaintiff, which, if granted, would have precluded Plaintiff from communicating his concerns regarding Student's education to certain NUSD representatives. Compl. at ¶ 9. Defendants' act of filing multiple TROs against Plaintiff could be considered by the trier of fact to be actions "reasonably likely to dissuade a person from engaging in protected activity," namely, advocating for a disabled student, and accordingly may amount to actionable retaliation. Pardi, 389 F.3d at 850. Therefore, Plaintiff has identified an adverse action that suffices for purposes of demonstrating retaliation.

### 3. Causal Connection

Courts have generally held that causation can be inferred from timing alone where the adverse action follows closely on the heels of the protected activity. See, e.g.,

1   Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273–74 (2001) (stating that the
2   temporal proximity must be "very close"); Alex G., 387 F. Supp. 2d at 1129.  When an
3   adverse action closely follows a complaint, retaliatory intent may be inferred.  See Bell v.
4   Clackamas County, 341 F.3d 858, 865-66 (9th Cir. 2003) (holding that proximity in time
5   may by itself constitute circumstantial evidence of retaliation); Pardi, 389 F.3d at 850.
6        Plaintiff lodged numerous complaints with NUSD personnel regarding the
7   educational services provided to Student by Defendants.  Specifically, the Director's
8   TRO application lists a January 14, 2011, letter from Plaintiff as a basis for the February
9   1, 2011, application.  Pl.'s Evidence at Ex. H.  The temporal proximity between Plaintiff's
10  protected activities and NUSDs' adverse acts, as well as the reflection of Plaintiff's
11  efforts in the applications for the TRO, sufficiently raises an inference of a causal link.
12  Since Plaintiff has successfully identified both a protected activity and an adverse action
13  arguably connected with that activity, the Court concludes that Plaintiff has made a
14  prima facie showing cognizable as a cause of action under both the ADA and the
15  Rehabilitation Act.

16       **4.**    **Burden Shifting**

17       As indicated above, once Plaintiff establishes a prima facie case of retaliation, the
18  burden then shifts to NUSD to show a legitimate, non-retaliatory purpose for its actions.
19  Pardi, 389 F.3d at 849.  Defendants "need only produce admissible evidence which
20  would allow the trier of fact rationally to conclude that the…decision had not been
21  motivated by discriminatory animus." Miller v. Fairchild Industries, Inc., 797 F.2d 727,
22  731 quoting Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 257 (1981);
23  Alex G., 387 F. Supp. 2d at 1129 (holding the school district's actions, rather than
24  retaliatory, were motivated by a desire to protect staff and fellow students from the
25  student's dangerous behavior).
26       NUSD adamantly insists that its actions were not done out of retaliation, but were
27  instead motivated by a desire to protect staff members from feeling threatened,
28  harassed, or interfered with in the execution of their educational purpose as a result of

1  Plaintiff's actions.  P&A in Support of Def.s' Mot. for Summ. J. ("Mot. for Summ. J."), ECF
2  No. 14, 19:1-3.  While the merit of any such conclusion raises a question of fact, the
3  Court will assume for purposes of analysis that the Defendant's alleged desire to protect
4  staff members is indeed a legally sufficient non-retaliatory explanation of the Defendants'
5  actions against Plaintiff.  That brings us to the final question of whether that explanation
6  amounts to more than mere pretext.

### 5. Pretext

If a defendant meets his burden of proving a legitimate non-retaliatory purpose for his actions, the plaintiff must then raise a genuine issue of material fact suggesting that defendant's "legitimate non-retaliatory" reason is pretextual." Yartzoff v. Thomas, 809 F.2d 1371, 1377 (9th Cir. 1987).  To defeat summary judgment on a retaliation claim under the ADA and Rehabilitation Act with a showing of pretext, a plaintiff must demonstrate that: (1) the defendant's proffered non-retaliatory reason for the adverse action is unworthy of credence; or (2) retaliation was the more likely motivation. Brooks v. Capistrano Unified Sch. Dist., 2014 WL 794581 (C.D. Cal. Feb. 20, 2014).

To show pretext, the plaintiff is not necessarily required to introduce evidence beyond that already offered to establish their prima facie case, although they may provide additional proof of the defendants' unlawful motivation.  See Burdine, 450 U.S. at 255; Pardi, 389 F.3d at 850 n.5.

Courts have recognized that true motivations are particularly difficult to ascertain. Miller, 797 F.2d at 733 citing United States Postal Service Board of Governors v. Aikens, 460 U.S. 711, 716 (1983) (holding that there will seldom be "eyewitness" testimony as to an individual's mental processes).  This makes such factual determinations generally unsuitable for disposition at the summary judgment stage.  Lowe v. City of Monrovia, 775 F.2d 998, 1009 (9th Cir. 1985) (stating that very little additional evidence is required to raise a genuine issue of fact regarding motive, concluding that summary judgment on the merits is ordinarily inappropriate once a prima facie case has been established).

Defendants rely on the reasoning in Alex G. for the supposition that Plaintiff

1  cannot sufficiently prove pretext, but that case is distinguishable based on the facts at
2  hand.  The court in Alex G. found that the plaintiff was unable to rebut defendants'
3  legitimate reason for their alleged retaliatory actions because there was no dispute of
4  fact.  Alex G., 387 F. Supp. 2d at 1129.  The court found that plaintiff's evidence
5  supported the defendant school districts' position that its personnel struggled to handle
6  an undisputedly difficult child while also protecting students and staff from potential
7  physical injury.  Id.  No such agreement exists with regard to the facts of the present
8  matter, which are disputed at every turn.  The issues here are simply not suitable for
9  decision on summary judgment.

10       The true rationale for Defendants' TRO filings, as well as whether any such
11 rationale was made for sufficiently "non-retaliatory" purposes, presents an "elusive
12 factual question."  Burdine, 450 U.S. at 255 n.8.  The Court thus finds that there are
13 triable issues with respect to this claim that preclude summary judgment.

14       **B.**    **Monetary Damages**

15       The issue of whether monetary damages are available for retaliation claims under
16 the Rehabilitation Act has not been decided by this Circuit.  Cefalu v. Holder, 2013 WL
17 5315079, at *17 (N.D. Cal. Sept. 23, 2013).  Defendant cites McCoy v. Dep't of the
18 Army, 789 F. Supp. 2d 1221, 1234 (E.D. Cal. 2011) for the proposition that
19 compensatory damages are not available for retaliation claims under the Rehabilitation
20 Act.  Mot. for Summ. J. at 19:25-28.  In McCoy, the district court relied on two controlling
21 Circuit cases.  The first case held that because the remedies for violations of the ADA
22 and the Rehabilitation Act are co-extensive with each other, and are linked to Title VI of
23 the Civil Rights Act of 1964, the ADA and Rehabilitation Act remedies must be construed
24 in the same manner applicable to remedies under Title VI.  Ferguson v. City of Phoenix,
25 157 F.3d 668, 673 (9th Cir.1998) (citing 42 U.S.C. § 12133 & 29 U.S.C. § 794a(a)(2)).
26 The second Ninth Circuit case cited by McCoy held that "punitive and compensatory
27 damages are not available for ADA retaliation claims."  Alvarado v. Cajun Operating
28 Company, 588 F.3d 1261, 1269 (9th Cir. 2009).  In attempting to harmonize the holdings

of Ferguson and Alvarado, the court in McCoy held that "it appears that in this circuit compensatory damages are not available for retaliation claims under the Rehabilitation Act." McCoy, 789 F. Supp. 2d at 1234.

Plaintiff, however, directs the Court to another Eastern District case, Herrera v. Giampietro, 2010 WL 1904827, at *9 (E.D. Cal. May 10, 2010). Pl.'s Memo. Of P&A in Opp. To Def.s' Mot. for Summ. J., ECF No. 15, 9:13-20. In Herrera, the district court held that a plaintiff may be entitled to monetary damages for her ADA retaliation claim against a public school district. Herrera, 2010 WL 1904827, at *9. The court was able to distinguish Alvarado based on the fact that the defendant in Herrera was a school district, which was a public entity, governed by 42 U.S.C. § 12133, whereas the defendant in Alvarado was a private entity governed by 42 U.S.C. § 12117. Id. Citing Barnes v. Gorman, 536 U.S. 181, 184–85 (2002), the Herrera court held that "the remedies available pursuant to section 12133 are coextensive with the remedies available in a private cause of action brought under Title VI of the Civil Rights Act of 1964, which include monetary damages." Id. Therefore, Herrera suggests that the Rehabilitation Act's retaliation provision, when applied to public entities such as NUSD, permits monetary damages.

As stated, because this issue has not been authoritatively decided by this Circuit, and because this Court finds the rationale of Herrera more persuasive, summary adjudication as to this damages issue would be inappropriate. Id.

///
///
///
///
///
///
///

**CONCLUSION**

16

Given the foregoing, the Court finds that NUSD has not demonstrated its entitlement to summary adjudication as to either of Plaintiff Brason Lee's claims. Defendants' Motion for Summary Judgment (ECF No. 14) is therefore DENIED.

IT IS SO ORDERED.

Dated: February 25, 2015

_____
MORRISON C. ENGLAND, JR, CHIEF JUDGE
UNITED STATES DISTRICT COURT